**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| BANK OF SPRINGFIELD,               ) <br>           ) <br> Plaintiff,             ) <br>           ) <br> v.                ) <br>           ) <br> MICHAEL F. SHANAHAN, JR., and   ) <br> MICHAEL F. SHANAHAN, JR., TRUSTEE ) <br> OF INDENTURE OF TRUST OF MICHAEL ) <br> F. SHANAHAN, JR. DATED NOVEMBER ) <br> 10, 1998,            ) <br>           ) <br> Defendants.         ) | No. 4:18CV2092 JCH |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff's Motion for Summary Judgment, filed November 22, 2019.  (ECF No. 34).  The motion is fully briefed and ready for disposition.

**BACKGROUND**

On or about August 11, 2015, for valuable consideration, Gateway Buick GMC, LLC, ("Gateway" or "Borrower") executed a Promissory Note in the original principal amount of $10,000,000.00 in favor of Plaintiff Bank of Springfield ("BOS" or "Lender") ("Note 1"). (Statement of Uncontroverted Material Facts in Support of Plaintiff's Motion for Summary Judgment ("BOS's Facts"), ¶ 1, citing BOS's Exh. 1, ECF No. 35-2).  That same day, Gateway and BOS executed a Business Loan Agreement in the amount of $10,000,000.00.  (*Id.*, ¶ 3, citing BOS's Exh. 2, ECF No. 35-3).  Defendant Michael F. Shanahan, Jr. ("Shanahan") executed a Commercial Guaranty, which provided in relevant part as follows:

> **CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE**.  For good and valuable consideration, Guarantor (Shanahan) absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the

- 1 -

Note and the Related Documents.  This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the indebtedness or against any collateral securing the indebtedness, this Guaranty or any other guaranty of the indebtedness….Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.**  The word "Indebtedness" as used in this Guaranty means the Loan and all other loan and Indebtedness of Borrower to Lender, including but not limited to Lender's payments of insurance or taxes, all amounts Lender pays to protect its interest in the Collateral, overdrafts and deposit accounts with Lender, and all other Indebtedness, obligations, and liabilities of Borrower to Lender, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising.

**CONTINUING  GUARANTY.**    THIS  IS  A  "CONTINUING GUARANTY"  UNDER  WHICH  GUARANTOR  AGREES  TO GUARANTEE  THE  FULL  AND  PUNCTUAL  PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY,  ANY  PAYMENTS  MADE  ON  THE INDEBTEDNESS  WILL  NOT  DISCHARGE  OR  DIMINISH GUARANTOR'S  OBLIGATIONS  AND  LIABILITY  UNDER  THIS GUARANTY  FOR  ANY  REMAINING  AND  SUCCEEDING INDEBTEDNESS  EVEN  WHEN  ALL  OR  PART  OF  THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME….

**GUARANTOR'S WAIVERS.**     Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any

other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness.  If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.**  Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law.  If any such waiver is determined to be contrary to any applicable law or public policy, such

- 3 -

> waiver shall be effective only to the extent permitted by law or public policy….
>
> **MISCELLANEOUS PROVISION.**        The following miscellaneous provisions are a part of this Guaranty:…
>
> **Attorneys' Fees; Expenses.**  Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty.  Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

(Commercial Guaranty, BOS's Exh. 3, ECF No. 35-4, PP. 1-3).  Pursuant to Note 1, BOS loaned Gateway $10,000,000.00.  (BOS's Facts, ¶ 7).[1]

On or about September 29, 2015, for valuable consideration, Gateway executed a Promissory Note in the original principal amount of $2,000,000.00 in favor of BOS ("Note 2").  (BOS's Facts, ¶ 9, citing BOS's Exh. 4, ECF No. 35-5).  That same day, Gateway and BOS executed a Business Loan Agreement in the amount of $2,000,000.00.  (*Id.*, ¶ 11, citing BOS's Exh. 5, ECF No. 35-6).  The Business Loan Agreement contained the following relevant provisions:

> **LINE OF CREDIT.**  Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base….

---

1 BOS claims that it relied on the 8/11/15 Commercial Guaranty executed by Shanahan in loaning money to Gateway pursuant to Note 1.  (BOS's Facts, ¶ 8).  Defendants admit only that the 8/11/15 Commercial Guaranty was executed as a condition of BOS loaning money to Gateway pursuant to Note 1.  (Defendants' Responses to BOS's Statement of Uncontroverted Material Facts ("Defendants' Response to BOS's Facts"), ¶ 8).

> **Mandatory Loan Repayments.**      If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base.   On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

(BOS's Exh. 5, P. 1).  Pursuant to a Business Loan Agreement dated August 23, 2016, and a series of Change in Terms Agreements between Gateway and BOS, the principal amount of Note 2 was increased to $3,125,000.00, and the maturity date was extended several times.  (BOS's Facts, ¶ 12, citing BOS's Exhs. 6, 7, ECF Nos. 35-7, 35-8).  On or about September 29, 2015, Shanahan executed a Commercial Guaranty, containing the same relevant terms as above quoted. (*See* BOS's Facts, ¶ 15, citing BOS's Exh. 8, ECF No. 35-9).  Pursuant to Note 2, BOS loaned Gateway $3,125,000.00.  (BOS's Facts, ¶ 17).[2]

On or about January 12, 2016, for valuable consideration, Gateway executed a Promissory Note in the original principal amount of $500,000.00 in favor of BOS as lender ("Note 3").  (BOS's Facts, ¶ 19, citing BOS's Exh. 10, ECF No. 35-11).  That same day, Gateway and BOS executed a Business Loan Agreement in the amount of $500,000.00, containing the same relevant terms as above quoted.  (*Id.*, ¶ 21, citing BOS's Exh. 11, ECF No. 35-12).  Pursuant to a series of Change in Terms Agreements between Gateway and BOS, the parties agreed to extend the maturity date of Note 3, and to replace the January 12, 2016, $500,000.00 Note with a $500,000.00 Note dated December 1, 2016 (also referred to as "Note

---

2 BOS again claims it relied upon the 9/29/15 and 8/11/15 Commercial Guaranties executed by Shanahan in loaning money to Gateway pursuant to Note 2, and Defendants lodge the same objection. (*See* BOS's Facts, ¶ 18 and Defendants' Response thereto).

3").[3]  (*Id.*, ¶ 23, citing BOS's Exhs. 12, 13, ECF Nos. 35-13, 35-14).  On or about January 12,

2016, Shanahan executed a Commercial Guaranty, containing the same relevant terms as above

quoted.[4]  (*See* BOS's Facts, ¶ 26, citing BOS's Exh. 14, ECF No. 35-15, P. 1).  Pursuant to Note

3, BOS loaned Gateway $500,000.00.  (BOS's Facts, ¶ 28).[5]

As noted above, the Business Loan Agreements associated with Notes 2 and 3 referenced

a "Borrowing Base."   The Borrowing Base under Note 2 was calculated as "70% of the

aggregate amount of Eligible General Motors Accounts Receivable."  (BOS's Exh. 5, P. 6).  The

Borrowing Base under Note 3 was calculated as "80% of the aggregate amount of Eligible

General Motors Accounts Receivable."   (BOS's Exh. 11, P. 6).   "Eligible General Motors

Accounts Receivable" in turn was limited to:

1) **Standard For Excellence** (SFE) Bonus Payments, less than 90 days from due date.  SFE payments are based on Customer Service metrics and Sales Volume measured by General Motors and paid monthly.  Borrower currently has a 99% SFE rating with General Motors.  Borrower accumulates a 3% Dealer Holdback that is paid quarterly by General Motors.

2) **Factor Rebates and Incentives** are receivables related to vehicle rebates/incentives directed by General Motors.  These receivables are based on sales of vehicles subject to specific rebates/incentives and are paid quarterly.

3) **Essential Brand Elements Remodel Escrow Receivables**—The Gateway Buick GMC, Inc. dealership has been selected to participate in General Motor's Essential Brand Elements brand remodel (EBE).  General Motors has announced an incentive to remodel/build dealerships across the country to improve overall customer experience, including complete remodel of showrooms, service departments and exterior lot displays.  With the estimated cost of $4.0 Million to build a new dealership facility, and to be equitable to dealers with existing facilities, General Motors has committed $4.0 Million to each dealer participating in the EBE remodel.  The $4.0 Million will be disbursed quarterly to an escrow controlled by General Motors, for each participating dealer, to fund remodel/new construction costs, through the 3rd

---

3 At times, Notes 1, 2 and 3 are referred to collectively as "the Notes."

4 At times, the three Commercial Guaranties are referred to collectively as "the Guaranties."

5 Once again, BOS claims it relied upon the Guaranties executed by Shanahan in loaning money to Gateway pursuant to Note 3, and Defendants lodge the same objection.  (*See* BOS's Facts, ¶ 29 and Defendants' Response thereto).

quarter with any balances in the account after compliance with EBE requirements disbursed directly to the dealership.

(BOS's Exh. 5, PP. 6-7; Exh. 11, PP. 6-7).

Gateway was required to provide BOS with monthly Borrowing Base certificates, monthly General Motors accounts receivable reporting, and monthly General Motors Dealership Factory Receivables.  (BOS's Exh. 5, P. 3; Exh. 11, P. 3).  According to Defendants, BOS relied on the Borrowing Base certificates to ensure that it did not extend a loan beyond the Borrowing Base calculation.   (Defendants' Statement of Additional Uncontroverted Material Facts ("Defendants' Facts"), ¶ 9, citing Forster Dep.[6], ECF No. 47-4, PP. 54:9-11, 58:7-11).   BOS counters that Forster testified only that Plaintiff used the Borrowing Base certificates to "monitor collateral value", and as a lending "goal."  (Plaintiff's Responses to Defendants' Statement of Additional Uncontroverted Material Facts ("BOS's Response to Defendants' Facts"), ¶ 9).  In other words, BOS claims "[t]he borrowing base provided Plaintiff with the contractual right to limit its advances in its sole discretion—i.e. Gateway could not force Plaintiff to advance more than the borrowing base at any given time, but Plaintiff was free to do so."  (*Id.*).[7]

Despite the differing Borrowing Base provisions of Loans 2 and 3, Gateway's Borrowing Base certificates lumped all of Borrower's eligible accounts receivable together, and calculated

---

6 Bruce Forster is BOS's former Vice President of Commercial Lending.  (*See* Forster Dep., P. 10:7-11).

7 Defendants attempt to support their position by noting Forster testified that on at least one occasion, BOS did make demands on Gateway to pay the difference between the outstanding principal and the borrowing base within a few months.  (*See* Forster Dep., PP. 65:20-66:3).  Defendants continue to assert that whenever BOS discovered an over-advancement of the loan, it notified Gateway and demanded repayment.  (Defendants' Facts, ¶ 10, citing Forster Dep., PP. 65:20-66:3).  BOS counters that in the event any loan was over-advanced, it typically made an informal effort to notify Gateway, but did not necessarily demand repayment.  (BOS's Response to Defendants' Facts, ¶ 10, citing Forster Dep., PP. 65:20-67:18).  BOS asserts this shows that "the 'call' provision was discretionary (as opposed to automatic in the event that the base was exceeded), demonstrat[ing] that the parties contemplated that borrowings beyond the borrowing base might occur and remain outstanding."  (*Id.*, ¶ 4).

the Borrowing Base using an 80% advance rate for both Loan 2 and Loan 3.  (Defendants' Facts,

¶ 11, citing Defendants' Exh. E, ECF No. 47-5).  For example, the August 10, 2016, Borrowing

Base Certificate misapplied the 80% advance rate to both loans and thus, according to

Defendants, incorrectly determined that the Borrowing Base limit was $3,134,872.00.  (*Id.*, ¶ 12,

citing Defendants' Exh. F, ECF No. 47-6).  Based on this miscalculation, BOS permitted

Gateway to borrow a maximum loanable amount of $2,507,898.00.  (*Id.*, ¶ 13).[8]

On or about August 23, 2016, Defendant Shanahan, as Trustee of the Indenture of Trust

of Michael F. Shanahan, Jr., dated November 10, 1998 ("Trust")[9], executed a Commercial

Guaranty on behalf of his Trust, containing the same relevant terms as above quoted (the "Trust

Guaranty").  (*See* BOS's Facts, ¶ 30, citing BOS's Exh. 9, ECF No. 35-10, P. 1).  BOS required

this Trust Guaranty as a precondition to its agreements (i) to increase the principal amount of

Note 2 to $3,125,000.00, (ii) to continue to advance money under the line of credit, and (iii) to

extend the maturity dates of the loans.  (*Id.*, ¶ 32).

Gateway has defaulted under Notes 1, 2, and 3, by failing to pay the amounts due under

the Notes.  (BOS's Facts,  34).  BOS therefore foreclosed on the real property of Gateway that

---

8 Had the 70% advance rate been applied on the August 10, 2016, Borrowing Base certificate, the permissible borrowing limit would have been $2,194,428.00.  (Defendants' Facts, ¶ 14). Defendants thus maintain BOS's miscalculation resulted in the overfunding of $313,470.00, in the period associated with the August 10, 2016 Borrowing Base certificate.  (*Id.*, ¶ 15). Similarly, Defendants claim the September 7, 2017, Borrowing Base certificate misapplied the 80% advance rate to both loans, and incorrectly calculated a $3,291,870.00 Borrowing Base limit.  (*Id.*, ¶ 16, citing Defendants' Exh. G, ECF No. 47-7).  Again, however, BOS counters that it alone had the discretion to extend advances beyond the borrowing base.  (*See* BOS's Response to Defendants' Facts, ¶ 12).
9 According to BOS, as a result of a typographical error, the Guaranty mis-identified the Trust as the Indenture of Trust of Michael F. Shanahan, Jr. dated November 10, 19<u>7</u>8, instead of 19<u>9</u>8. (*See* BOS's Facts, P. 5 n. 3).

had been pledged as collateral for Note 1.  (*Id.*, ¶ 35).[10]  By letter dated December 6, 2018, BOS

demanded that the Guarantors pay the unpaid principal under Notes 1, 2, and 3, together with

accrued interest and any other amounts due (the "Demand Letter").  (*Id.*, ¶ 37, citing BOS's Exh.

15, ECF No. 35-16).[11]   According to BOS, Defendants have failed and refused to pay the

indebtedness, including interest, late fees, and all other amounts due, owing on Notes 1, 2, and 3

(the "Indebtedness"), which Indebtedness as of November 15, 2019 (after applying all credits

due) totals as follows:

> **Note 1:**     $906,629.13
> **Note 2:**     $3,887,749.80
> **Note 3:**     $262,641.12

(*Id.*, ¶ 38, citing BOS's Exh. 16, ECF No. 35-17).[12]

BOS filed its original Complaint in this matter on December 18, 2018.  (ECF No. 1).  In

its First Amended Complaint, filed March 25, 2019, BOS asserts claims for Action on

Commercial Guaranty against Defendant Michael F. Shanahan, Jr., Individually (Count I), and

against Michael F. Shanahan, Jr., Trustee under the Trust (Count II).  (ECF No. 14).  As stated

above, BOS filed the instant Motion for Summary Judgment on November 22, 2019, asserting

there exist no genuine issues of material fact, and it is entitled to judgment as a matter of law on

both its claims for breach of guaranty agreements and as to all affirmative defenses asserted by

Defendants.  (ECF No. 34).

---

10 BOS credit bid $9,290,000.00 at the foreclosure, and was the highest bidder.  (BOS's Facts, ¶ 36).
11 According to the Demand Letter, the unpaid balances were as follows:  $922,037.51 owing on Note 1, together with additional amounts as set forth in the Note; $3,445,642.70 owing on Note 2, together with additional amounts as set forth in the Note; and $553,600.57 owing on Note 3, together with additional amounts as set forth in the Note.  (*See* BOS's Exh. 15, P. 1).
12 Defendants object to BOS's damages calculations, stating BOS's affidavit and exhibit do not provide sufficient support for its asserted damages.  (*See* Defendants' Response to BOS's Facts, ¶¶ 38-41).

- 9 -

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant.  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247.  The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255.  The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial.  *Id.* at 249.

## DISCUSSION

### I.      Liability

Under Illinois law[13], "[t]o succeed on a claim for breach of contract, a plaintiff must plead and prove the existence of a contract, the performance of its conditions by the plaintiff, a breach by the defendant, and damages as a result of the breach."  *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd..*, 876 N.E.2d 218, 226 (Ill. App. 2007) (citation omitted). The rules of construction applicable to contracts generally apply equally to contracts of guaranty. *BA Mortg. and Intern. Realty Corp. v. American Nat. Bank and Trust Co. of Chicago*, 706 F.Supp. 1364, 1376 (N.D. Ill. 1989).  Guaranty agreements are strictly construed in favor of the guarantor, however, and this is especially true where, as here, the guaranty is on a printed form supplied by the party to whom the guaranty runs.  *City Nat. Bank of Murphysboro, Ill. v. Reiman*, 601 N.E.2d 316, 322 (Ill. App. 1992).  Thus, a "guarantor is to be accorded the benefit of any doubt which may arise from the language of the contract, and his liability is not to be varied or extended by construction or implication beyond its precise terms."  *Riley Acquisitions, Inc. v. Drexler*, 946 N.E.2d 957, 965 (Ill. App. 2011).  *See also Cohen v. Continental Illinois Nat. Bank & Trust Co. of Chicago*, 618 N.E.2d 1060, 1064 (Ill. App. 1993) ("A guarantor is not liable for anything to which he did not agree.").   When the language of a contract is clear and unambiguous, however, extrinsic facts are not to be considered.  *Reiman*, 601 N.E.2d at 322.

> Where a contract of guaranty is unequivocal in its language, courts will construe it in accordance with the language and intentions of the drafting parties. This is true even where the guaranty contains broad statements of guarantor liability.  Guaranty agreements containing waivers of all defenses, including the duty to act in a commercially reasonable manner, have been upheld as validly binding.

*Chemical Bank v. Paul*, 614 N.E.2d 436, 441-42 (Ill. App. 1993) (citations omitted).  *See also Bank of America, N.A. v. 108 N. State Retail LLC*, 928 N.E.2d 42, 55 (Ill. App. 2010) (citations omitted) ("[F]irst we note that a decision by a party to contractually agree to waive all defenses

---

13 The parties agree that the Notes and Guaranties are governed by Illinois law.

is permitted under Illinois law….Therefore, defendants were not precluded from entering an agreement waiving their defenses, and this court is not precluded from upholding it.").

In its Motion for Summary Judgment, BOS claims that summary judgment in its favor is warranted because the undisputed record establishes all elements of BOS's claims for breach of guaranty, and Defendants' affirmative defenses have been waived by Defendants and/or are precluded as a matter of law.  (Memorandum in Support of Plaintiff's Motion for Summary Judgment, PP. 8-14).  In response, Defendants assert genuine issues of material fact remain regarding whether BOS complied with the terms of the Business Loan Agreements and Guaranties, such that they can enforce the Guaranties against Defendants.  (Defendants' Memorandum in Opposition to Plaintiff BOS's Motion for Summary Judgment ("Defendants' Opp."), PP. 9-14).  In support of this contention, Defendants first note that they agreed to guaranty only the "Indebtedness" of Borrower, which is a defined term in the Business Loan Agreements.  (*Id.*, P. 10).  According to Defendants, Indebtedness (pursuant to the Business Loan Agreements) amounted to all advances made to Borrower, and advances in turn were not to exceed the Borrowing Base.  (*Id.*).  Defendants assert that in breach of those provisions, "BOS advanced money to Borrower beyond the Borrowing Base calculation because (i) it used the wrong advance rate to make this calculation; (ii) it combined/double counted the same receivables; and (iii) [it] failed to verify whether the receivables that Borrower was self-reporting were even valid (many of which turned out not to be valid)."  (*Id.*, PP. 10-11).

BOS counters that Defendants' contention that language in the Business Loan Agreements, that "Lender agrees to make Advances to Borrower…provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base", somehow placed an absolute limit on BOS's lending ability, is nonsensical.  (Plaintiff's Reply

Memorandum in Support of Plaintiff's Motion for Summary Judgment ("BOS's Reply"), PP. 1-2, quoting, *e.g.*, BOS's Exh. 5, P. 1).   BOS explains that while "Advances" are defined as "disbursement[s] of Loan funds made", "Loan" itself is defined broadly (without reference to the Borrowing Base), as "any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced."  (*Id.*, P. 2, quoting, *e.g.*, BOS's Exh. 5, PP. 6-7).   BOS continues to point out that the other loan documents made clear Gateway, and therefore Defendants, agreed to repay whatever BOS decided to loan, without regard to whether any advances exceeded Borrower's Borrowing Base.  (*Id.*, P. 2).   For example, the Promissory Notes executed by Gateway defined "Indebtedness" as "the Loan *and all other loan and indebtedness of Borrower to Lender, including but not limited to....all other indebtedness, obligations, and liabilities of Borrower to Lender, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising.*"   (*See, e.g.,* BOS's Exh. 4, P. 1 (emphasis added)).  Defendants' Guaranties followed suit, defining "Indebtedness" in identical terms.  (*See, e.g.*, BOS's Exh. 8, P. 1).  Defendants "absolutely and unconditionally guarantee[d] full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents."  (*See, e.g.*, BOS's Exh. 8, P. 1).  Thus, according to BOS, the loan documents provided it with the right, but not the obligation, to loan Gateway amounts in excess of the Borrowing Base, and both Gateway and Defendants understood and agreed to repay whatever amount BOS chose to advance. (BOS's Reply, P. 3).

BOS further responds to Defendants' suggestion that its advances beyond the Borrowing Base percentages, allegedly made despite BOS's notice of Gateway's precarious financial

position, somehow varied the Guaranties and increased Defendants' exposure, by noting that

Defendants agreed BOS might "'without notice or demand….alter, compromise, renew, extend,

accelerate or otherwise change one or more times…other terms of the Indebtedness or any part

of the Indebtedness.'"   (BOS's Reply, P. 4, quoting, *e.g.*, BOS's Exh. 8, P. 1).   BOS notes

Defendants further explicitly waived "any right to require Lender…to make any presentment,

protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness

or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of

Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness

or in connection with the creation of new or additional loans or obligations." (*See, e.g.*, BOS's

Exh. 8, P. 2).  Perhaps most importantly, Defendants warranted they had

> …established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

(*See* BOS's Reply, P. 4, quoting, *e.g.*, BOS's Exh. 8, P. 2).[14]

Upon consideration of the foregoing, the Court holds BOS did not breach the terms of the

Guaranties by loaning money to Gateway in excess of the applicable Borrowing Bases.  The

Court agrees that despite the inclusion of provisions regarding Borrowing Base, BOS maintained

the right to loan Gateway funds equal to the amount of the Loan, and it had no obligation to

---

14 BOS asserts Defendant Shanahan was uniquely well-positioned to keep informed of Gateway's financial condition as he, among other things, was substantively involved in Gateway's business operations, particularly as they related to its relationships with its lenders, reviewed term sheets and proposed loan documents, kept apprised of loan balances and advances, and inquired about Gateway's Borrowing Base and was notified when it was over-advanced.  (BOS's Reply, P. 5; *see also* BOS's Response to Defendants' Facts, ¶ 34 and Exhibits cited to therein).

communicate directly with Defendants its intention to do so.  *See JPMorgan Chase Bank, N.A. v. East-West Logistics, L.L.C.*, 9 N.E.3d 104, 115-116 (Ill. App. 2014).[15]

Defendants next assert that with its actions, BOS breached the covenant of good faith and fair dealing.  (Defendants' Opp., PP. 11-14).  Under Illinois law, a covenant of good faith and fair dealing is implied in every contract, including guaranties.  *JPMorgan Chase*, 9 N.E.3d at 118.  "The duty of good faith requires the party vested with contractual discretion to exercise it reasonably, and he may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties."  *Id.* (internal quotations and citation omitted).  Therefore, "[a] creditor has a good-faith obligation to inform the guarantor of facts known to the creditor that materially increase the guarantor's risk beyond that which the creditor has reason to believe the guarantor intended to assume, and which the creditor may reasonably believe are unknown to the guarantor."  *Id.* (internal quotations and citation omitted).  Notwithstanding these principles, however, "an implied covenant of good faith cannot overrule or modify the express terms of a contract," and a "guarantor may not rely on the covenant of good faith and fair dealing to read into a contract an obligation that does not exist."  *Id.* (internal quotations and citations omitted).

In their response to BOS's motion, Defendants maintain that pursuant to the implied covenant of good faith and fair dealing, "BOS was obligated to act consistent with the parties' expectations and not take any action that varied from the Guaranty and increased Defendants' exposure as guarantors of Borrower's indebtedness beyond what was agreed upon in the Business Loan Agreements and therefore expected."  (Defendants' Opp., P. 12).  Defendants

15 Defendants do not contend that at any time, BOS loaned more than the total amount of the principal stated in the Business Loan Agreements.  This fact distinguishes the instant case from *King Korn Stamp Co. v. Guaranty Bank & Trust Co*, as in that case, the defendant bank extended the debtor more credit than was specifically set out and guaranteed by the plaintiff in the guaranty agreement.  *See King Korn Stamp Co. v. Guaranty Bank & Trust Co*., 252 N.E.2d 734, 739 (Ill. App. 1969).

assert that despite this obligation, "BOS demonstrated a lack of due diligence as it[] advanced funds to Borrower that ultimately overfunded Borrower's loan in excess of the amount contemplated by the Loan Agreements and the Guaranties." (*Id.*).  Specifically, Defendants claim that although BOS had concerns about Gateway's projected business performance and viability even before it executed the Loan Documents, and questions regarding Gateway's performance and business records persisted throughout the loan period, BOS nevertheless "executed the Notes and continued to increase the loan amounts even as Borrower demonstrated the inadequate business performance projected by [BOS's} loan review committee."   (*Id.*). Based on these assertions, Defendants maintain genuine issues of material fact exist as to whether BOS acted in good faith in its performance of the loan.  (*Id.*, P. 14).

"The duty of good faith and fair dealing does not alter the terms of the guaranty." *JPMorgan Chase*, 9 N.E.3d at 118.  As noted above, under the Guaranties at issue here BOS maintained the right to loan Gateway funds equal to the principal amount of the loans, and it was Defendants' responsibility to keep apprised of Gateway's financial state, in order to ascertain their own risk as guarantors.  *Id.*; *see also, e.g.*, BOS's Exh. 8, P. 2.  Under these circumstances, the Court finds Defendants fail sufficiently to allege a breach of the duty of good faith and fair dealing by BOS, and so BOS's Motion for Summary Judgment on the issue of liability must be granted.  *See Bank One, Springfield v. Roscetti*, 723 N.E.2d 755, 763-67 (Ill. App. 1999).

## II.  <u>Damages</u>

Defendants next assert that material issues of disputed fact remain as to BOS's alleged damages.  (*See* Defendants' Opp., PP. 14-16).  As support for its damages claim, BOS submitted an affidavit from Ms. Lora Huebner, Senior Vice President and Chief Credit Officer of BOS. (ECF No. 35-1).  Ms. Huebner testified as follows regarding damages:

27.     Borrower defaulted under Notes 1, 2 and 3 by failing to pay the amounts due on the Notes when due.

28.     Following default, BOS foreclosed on the real property of Borrower that had been pledged as collateral for Note 1.

29.     BOS credit bid $9,290,000 at the foreclosure, and was the highest bidder….

31.     The Defendants have failed and refused to pay the indebtedness, including interest and late fees and all other amounts due, owing on Note 1, Note 2 and Note 3 (said indebtedness is referred to as the "**Indebtedness**") to Plaintiff BOS, which Indebtedness, as of November 15, 2019, totaled as follows:

>     Note 1**:**        $906,629.13
>     Note 2:        $3,887,749.80
>     Note 3:        $262,641.12

Interest continues to accrue on Note 1 in the amount of $322.49 per diem, on Note 2 in the amount of $1,277.76 per diem, and on Note 3 in the amount of $56.58 per diem, for a total per diem of $1,656.83….

32.     All payments made by Borrower or anyone else in partial satisfaction of the amounts due and owing under the Notes have been credited to the Notes and are accounted for in the balance due set forth above….

36.     BOS has been damaged by Defendants' refusal to pay the Indebtedness in the amount of $5,057,020.05 as of November 15, 2019, plus attorney's fees, expenses incurred to collect amounts owed under the Notes, Guaranties and Trust, as well as interest that continues to accrue on the Notes at the rate of $1,656.83 per diem.

(*Id.*, PP. 6-7).  BOS also attaches an unlabeled exhibit, which purports to show principal, interest,

late charges, per diems, foreclosure sales revenue, and payments received as to each Note.  (*See*

ECF No. 35-17).

Upon consideration the Court finds BOS's evidence of damages is insufficient, as it

provides little or no explanation as to the underlying basis for the amounts claimed.   For

example, in its exhibit BOS at times attributes an interest rate of 15(%) (without explaining how

it arrived at that rate), and at other times does not disclose the interest rate applied.  BOS further

fails to describe the basis for the imposed late charges.  Under these circumstances, the Court

agrees that Defendants lack the information necessary to verify or dispute the provided figures;

instead, both they and the Court are left to guess as to the accuracy of BOS's calculations.

BOS's Motion for Summary Judgment on the issue of damages must therefore be denied.  *See*

*Firstmerit Bank, N.A. v. Donlin Builders, Inc.*, 2016 WL 1247452, at \*4 (N.D. Ill. Mar. 30,

2016).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No.

34) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.


Dated this 6th Day of May, 2020.


/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE